**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| JOSHUA NICHOLSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:19cv585 |
| | ) | |
| JULIE ZIMMERMAN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

<u>**MEMORANDUM OPINION AND RECOMMENDATION**</u>
<u>**OF UNITED STATES MAGISTRATE JUDGE**</u>

This case comes before the Court on "Defendants Stacy Bowen and Maxim Healthcare Services, Inc.'s Amended Motion to Dismiss" (Docket Entry 32) (the "Motion"). For the reasons that follow, the Court should grant the Motion as specified herein.

<u>**BACKGROUND**</u>

Alleging violations of his constitutional and statutory rights during his incarceration with the North Carolina Department of Public Safety (the "NCDPS") in the summer of 2016, Joshua Nicholson (the "Plaintiff") initiated a lawsuit against various defendants, including Stacy Bowen ("Bowen") and Maxim Healthcare Services, Inc. ("Maxim," and collectively, the "Maxim Defendants") (Docket Entry 1 (the "Complaint"), ¶¶ 4-5). (<u>See generally</u> Docket Entry 1.) Maxim Defendants moved to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "Rules") (<u>see</u> Docket Entry 16), contending that "[d]ismissal is appropriate because, based solely upon the allegations of the Complaint, or

rather lack thereof, Plaintiff has failed to state a claim upon which relief can be granted" (Docket Entry 17 at 1).[1]  In response, Plaintiff filed an amended complaint (see Docket Entry 23) (the "Amended Complaint"), which Maxim Defendants also moved to dismiss under Rule 12(b)(6) (see Docket Entry 32 at 1).  As relevant here, the Amended Complaint alleges:

On or around June 6, 2016, a state-court judge sentenced Plaintiff for various state crimes, "recommend[ing as part of the sentence] substance abuse treatment, a mental health evaluation, and compliance with any treatment recommendations." (Docket Entry 23, ¶ 13.)  Thereafter, "[Plaintiff] was transferred to Piedmont Correctional Institution ('Piedmont')," at which time "Nurse Glover" apparently performed a health screening that identified "(a) history of inpatient mental health treatment (1-3 times), (b) a current mental health complaint, (c) treatment for depression, including antipsychotic prescription Risperdal, Valium and Cogentin, (d) and a note from the mother stating [Plaintiff] was schizophrenic." (Id., ¶ 14.)  "Nurse Glover listed the mental health complaint as a potential item for follow up" and "scheduled a mental health referral request for [Plaintiff] to see a psychologist due to the schizophrenia diagnosis."  (Id.)

_____

1  Citations herein to Docket Entry pages utilize the CM/ECF footer's pagination.

Two days later, on June 16, 2016, Julie Zimmerman ("Zimmerman"), a defendant in this litigation (id., ¶ 2), conducted "a mental health assessment on [Plaintiff]," which "discussed his mental health history which included Brief Psychotic Disorder, Schizophrenia, Mood Disorder, and importantly, [Plaintiff's] report[] that he had a psychiatric admission at CaroMont in Gastonia shortly before his jail admission and that he was hearing voices." (Id., ¶ 15.) Zimmerman further noted that Plaintiff possessed "an IQ of 72 and a learning disability," which she stated "placed him in the 'borderline range of intellectual functioning.'" (Id., ¶ 16.) "A Beta IQ of 72 put Zimmerman on notice that [Plaintiff] had a severe learning disability and borderline retardation, and presented the same cognitive ability as an 8-year-old child." (Id.)

"Despite having this information and patient history, it is clear from Zimmerman's notes in the 'Interview,' 'Assessment,' and 'Plan' portions of the assessment that she largely ignored [Plaintiff's] history and test scores, and instead recommended him to be integrated into the regular population of the prison" (id.), notwithstanding both her acknowledgment that "[Plaintiff] required inpatient admission both times he had previously been incarcerated" and Plaintiff's specific request "to again go to Central Prison ('CP') inpatient in Raleigh" (id., ¶ 17). Zimmerman indicated "that her goal was for [Plaintiff] to 'maintain a stable mental

3

status as evidenced by requiring no inpatient admissions.'" (Id.) In making such plan, Zimmerman failed to "follow the NCCHC guidelines for Mental Health Screening and Evaluation." (Id., ¶ 18.)[2] Nevertheless, as per NCDPS protocol, "it is believed that Zimmerman . . . arrang[ed two] IQ tests for [Plaintiff] since his prior IQ test was more than 5 years old." (Id., ¶ 20.) These tests, conducted on June 17, 2016, and June 20, 2016, returned scores of 63 and 67, respectively, "plac[ing] Mountain View on notice that [Plaintiff] required significant [Americans with Disabilities Act (the "ADA")] accommodation and inpatient care." (Id.)

"On or about June 21, 2016, [Plaintiff] was 'seen' at [Piedmont's] outpatient program by [another defendant,] Joseph Williams, MD [('Williams')] (via telepsychiatry). In the exam, Williams does not mention [Plaintiff's] IQ or educational background, he downplays the psychotic episodes, and he fails to thoroughly discuss the inpatient treatments [Plaintiff] received." (Id., ¶ 19.) Williams's "final 'Plan' [wa]s for [Plaintiff] to return in 6-8 weeks." (Id.) A couple hours later, "Zimmerman made an administrative note regarding [Plaintiff's] old NCDPS chart," which includes "a detailed accounting of [Plaintiff's] psychotic behavior with a final sentence that reads, 'I do not believe he has

_____

2 The Amended Complaint does not further identify "NCCHC" or its Mental Health Screening and Evaluation guidelines. (See generally Docket Entry 23.)

4

the mental capacity to effectively fake a mental illness.' Despite this fact, no action was taken." (Id., ¶ 21.)

Apparently also on June 21, 2016, Plaintiff transferred to "Mountain View" (id., ¶ 22), where "an Intake health screen was conducted by [another defendant named Robin] Caison, who listed 'outpatient only' as the history of mental health treatment. She stated that there was current mental health treatment but no mental health complaint." (Id., ¶ 23.)[3] "It is believed that Mountain View had received Piedmont's IQ test results prior to [Plaintiff's] transfer." (Id., ¶ 22.) "On June 28, 2016, [Plaintiff] did not respond to internal stimuli and repeatedly asked the same question to the social worker, Jennifer Johnson[ ('Johnson'), another defendant in this litigation]. Despite his abnormal behavior, Johnson did not mark any concerns for [Plaintiff]." (Id., ¶ 24.)

Johnson also saw Plaintiff "on Friday, August 12, 2016, this time for crisis intervention relating to reported problems with his roommate, and [Plaintiff] requested to be put in a room by himself. [Plaintiff] presented with marks on his face and could not look Johnson in the eye while talking to her." (Id., ¶ 25.) "Based on Johnson's notes, Johnson was not concerned about [Plaintiff's] safety and no changes were reported regarding the roommate

_____

3  In this regard, a health screen at Piedmont "on or about June 6, 2016," listed "inpatient treatment," but "marked 'no'" for "current mental health treatment/complaint." (Id., ¶ 21; but see id., ¶ 14 (alleging that Plaintiff transferred to Piedmont "[o]n or about June 14, 2016").)

situation.  It is believed [Plaintiff] was raped and assaulted on and before this date."  (Id.)

The following Monday, August 15, 2016, Johnson treated Plaintiff "due to 'vague threats of harm to himself and/or others.' Johnson noted that [Plaintiff] contracted for safety and she placed him on Behavior Observations overnight.  He was to be re-evaluated the next morning.  The records provided to Plaintiff's counsel make no reference to [Plaintiff's] roommate situation at this time." (Id., ¶ 26.)  Next:

> Almost an hour later, on Monday, August 15, 2016, [Plaintiff] was treated by Stacy Bowen, RN, for an injury to his arm.  The injury to [Plaintiff's] arm was consistent with some of the notes provided in Blue Ridge Hospital's records concerning [Plaintiff] being sexually assaulted, yet Bowen treated it as a minor injury with no mention of sexual assault.  This, in addition to other information received by Bowen, allowed Bowen to draw the inference that a sexual assault had occurred, and Bowen[,] upon information and belief, drew such an inference.  Upon information and belief, Bowen also knew or should have known that [] Plaintiff had suffered a bruised backside.  Bowen ignored various glaring signs that [] Plaintiff had been, and was at further risk of being, a victim of sexual assault.  Bowen detected and ignored [] Plaintiff's injury, and ignored [] Plaintiff's attempts to provide additional detail beyond the obvious physical signs of injury.  Bowen was otherwise deliberately indifferent to the obvious continued risk of harm to [] Plaintiff in these and other ways.

(Id., ¶ 27.)

At 9:30 the next morning, Tuesday, August 16, 2016, Johnson evaluated Plaintiff.  (Id., ¶ 28.)  The records from this evaluation reveal "that [Plaintiff] was scared for his safety and that he was unable to follow basic questions or instructions."

6

(Id.)  The records further reflect Plaintiff's recent IQ scores of 63 and 67.  (Id.)  "NCDPS procedure and policy manual" requires, for "any IQ score below 70[,] . . . an immediate referral to Behavioral Health Services," as well as immediate contact with "a qualified Behavioral Health professional" to "conduct a more in-depth mental health assessment."  (Id.)  "However, neither Zimmerman, Williams, nor Johnson followed these guidelines, and instead Johnson just made a note to follow up in 24 hours."  (Id.)

Consistent with that note, around 9:30 a.m. on Wednesday, August 17, 2016,[4] another NCDPS employee identified only as "'Dalton'" conducted "a developmental disability assessment" of Plaintiff.  (Id., ¶ 29.)  This assessment reflected certain deficiencies, including in Plaintiff's "capacity for independent living," such that "Dalton found that [Plaintiff] was classified as a mental health 3 status developmentally disabled inmate, and was added to the DD Caseload."  (Id.)  Dalton's assessment further reflects that "'Treatment goals are being established today with a focus on encouraging [Plaintiff] to make decisions to protect his self-interests, request assistance when needed, and protect himself from exploitation or personal harm by others.'"  (Id., ¶ 30.)  "Dalton further stated that '[Plaintiff] is being encouraged to notify staff if there are any incidents of other inmates attempting

---

4  Per the Amended Complaint, "[o]n Wednesday, August 17, 2016, a very strange and alarming series of events unfolded that cannot be explained by the records."  (Id., ¶ 29.)

to exploit or take advantage of him. [Plaintiff] has remained infraction-free thus far since his admission to prison.'" (Id.)

At 2:10 p.m. and 2:31 p.m. that same day, Dalton added "the Case Manager Orientation and DC-927 Evaluation Form" to Plaintiff's records. (Id., ¶ 31.) "Less than 30 minutes later, there was an urgent request by Sarah Condrey to transport [Plaintiff] to Blue Ridge Regional Hospital for an alleged sexual assault. The only other record from Mountain View is dated August 18, 2016." (Id.) As to what followed:

> The Blue Ridge Regional Hospital Emergency Room record states, in relevant part, that "[Plaintiff] is a 27 year old male with a significant past medical history of schizophrenia who initially reported to the Mountain View correctional nursing staff complaining of suicidal ideations. After observing him for some time patient then began to state that someone had 'messed with him.' It is difficult to know exactly what transpired but at some point he was released back to his [cell] over the last several days. He presented again today complaining of pain stating that someone "messed with him." "[N]ursing staff became concerned and so they requested that he come to the ER for evaluation because they felt that he had been sexually assaulted by his cellmate." There is no mention of someone "messing with him" in Mountain View records. Mountain View records make no mention of the nursing staff being concerned about [Plaintiff] or his safety. [Plaintiff] was released back into his cell after the nursing staff was made aware of [Plaintiff's] condition.

> The Blue Ridge Regional Hospital Emergency Room record further states that "During this time, Mountain View correctional called back to state that there was recent blood in his cough as well as several 'instruments' [that] did have blood on them as well and prison staff was treating the cell as a crime scene. They freely admit that he does not have the ability to give a good history therefore the [sic] requested further workup. During my interview, patient is extremely

8

guarded but does state that someone hurt him but won't quite say how. He did admit to having some blood coming out of his rectum with direct questioning but would not bring this out without questioning." There is no record from Mountain View of this phone call to Blue Ridge. There is no medical record from Mountain View in regard to blood in [Plaintiff's] cough or on several "instruments." There is no record from Mountain View in regard to [Plaintiff's] cell being treated as a crime scene. There is no record from Mountain View in regard to [Plaintiff's] cellmate raping him. Further down in the Blue Ridge medical record, Dr. Cornelius states that [Plaintiff] cannot even provide his own date of birth.

After being treated at Blue Ridge, [Plaintiff] was transferred to Mission Hospital at approximately 7:00 pm on Wednesday, August 17, 2016. The emergency room report from Mission, in relevant part, states that "I spoke with Ms. Buchanan at the facility and also with the officers at the bedside as well as the patient." "On Monday the patient may [sic] reports of possible self-harm and [was] placed in an area where he had mental health and 'restricted housing.'" "Ms. Buchanan said that they found bruises on his backside as well as his arms and she got involved with further investigation and went to the patient's cell." "When Ms. Buchanan flipped over the mattress, she found that the underside mattress cover had blood on it about the size of a dinner plate. She also found a wash rag was hanging on the puncture [sic] rag dry that she said may have had blood on it that was washed out. She states that the psychologist spoke with the patient and the patient did admit to being victimized and assaulted." The records reflect that [Plaintiff] is developmentally delayed and has the functional status of an 8-year-old. The records further reflect that Ms. Buchanan "did tell me the patient was found [sic] have a black eye on Friday evening that was not there earlier that day."

Plaintiff's counsel was not provided any records showing that a Ms. Buchanan worked at Mountain View, nor was counsel provided any records with her notes. Mountain View provided two medical records from August 15, 2016, . . . but neither of those records indicated sexual assault. Mountain View assured counsel for Plaintiff that it provided all its records concerning [Plaintiff]. Mountain View has no records describing the bruising on [Plaintiff's] body, Buchanan's investigation,

9

flipping over a mattress and finding blood the size of a dinner plate, the bloody rag, a black eye, [Plaintiff's] roommate situation, or treating [Plaintiff's] cell as a crime scene. There is no record of a psychologist visit. Mission Hospital records indicate that Buchanan examined [Plaintiff] on Monday, August 15, 2016, yet Mountain View did not send [Plaintiff] to the emergency room until two days later, and interestingly, after Mountain View examined [Plaintiff] for a developmental disability.

The emergency room report from Mission further states that "Ms. Buchanan told me that the patient said he was afraid to sleep at night because he was afraid that they would kill him. Patient denies any rectal bleeding. Review systems difficult to obtain from the patient given his about [sic] mental delay." Mountain View records are devoid of any reference to a Ms. Buchanan or [Plaintiff's] concerns about someone trying to kill him.

On Thursday, August 18, 2016, [Plaintiff] was returned to Mountain View. He was seen by Keith D'Amico for an injury. [Plaintiff] made repeated visits for evaluation and crisis intervention on August 18, 2016. He remained on Behavioral Observation.

On Friday, August 19, 2016, [Plaintiff] presented again with an elevated risk of self-injury. He again requested not to be put back in his cell. It is believed that despite [Plaintiff] being raped and sexually assaulted, Mountain View placed [Plaintiff] back in a cell with a cellmate.

Check-ups continued until [Plaintiff] was transferred to Pender [Correctional Institute] on or about Monday, August 22, 2016. . . .

(Id., ¶¶ 32-39 (internal paragraph numbering omitted) ("[sic]" notations and certain brackets in original).)

"At the time of the incidents at issue, [] Plaintiff had clearly established rights under the United States Constitution[]" to, inter alia, "be free from cruel and unusual punishment," including "deliberate indifference to [either] a substantial risk

10

of serious harm" or his "medical needs." (Id., ¶ 50.) "Defendants violated these clearly established rights in the ways described in summary form herein, and in ways that will be uncovered in discovery and at trial." (Id., ¶ 51.) "The unconstitutional misconduct described herein was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Plaintiff's clearly established constitutional rights." (Id., ¶ 52.) "As a direct and proximate result of the above constitutional violations, [] Plaintiff suffered serious physical and emotional injury." (Id., ¶ 53.) "As to Maxim and Worldwide, the constitutional violations described herein involved execution of the entities' official policies and custom. These policies and customs were the moving force behind the constitutional violations. [] Plaintiff specifically does not allege that Maxim and Worldwide are liable merely via _respondeat superior_." (Id., ¶ 54.)

In addition, "Defendants each had personal involvement in the wrongs enumerated in this Complaint in which they are named, through personal direction and/or actual knowledge and acquiescence as described herein." (Id., ¶ 56.) "All of [] Defendants conspired with one another to deprive Plaintiff of his health, well-being and peace of mind." (Id., ¶ 57.) Moreover:

[This] conspiracy included, but was not limited to:

a. Conspiracy to violate the Eighth and Fourteenth Amendment Rights of Plaintiff in violation of the Civil Rights Act, Title 42 U.S.C. § 1985;

11

b. Conspiracy to deprive Plaintiff of his physical, mental, and emotional health;

c. Conspiracy to harm Plaintiff as indicated earlier in this Complaint;

d. Conspiracy to cover-up the sexual abuse and assaults of Plaintiff's cellmate.

Upon information and belief, all of [] Defendants had various incentives to participate in the conspiracy. For example, all of [] Defendants and their employees are incentivized to carry out medical visits as quickly as possible. For the contractors and their employees, the quicker the medical visits are carried out, the more profitable for the contractors. For NCDPS and their employees, there are specific metrics in place to gauge how many medical visits and sick call requests and grievances are closed out. There is no mechanism in place within NCDPS for inmates to challenge the adequacy of medical care provided, so the only incentive [D]efendants have is to complete medical appointments as quickly as possible, and to close sick calls and grievances as quickly as possible. Due to this and other reasons, [] Defendants acted in concert to coverup [sic] the assaults on [] Plaintiff.

The above acts were committed by all of [] Defendants, acting under the color of state law and authority and violated clearly established statutory or constitutional rights of Plaintiff of which a reasonable person would have known.

(Id., ¶¶ 57-59 (internal paragraph numbering omitted).) "As a direct and proximate result of Defendants' conspiracy to harm and/or cover-up such harm and/or deliberate indifference and/or failure to protect Plaintiff, [Plaintiff] suffered severe and permanent emotional distress and mental anguish together with a total deprivation of his rights guaranteed by the Constitution of the United States of America." (Id., ¶ 64.)

Finally, "Defendants have discriminated against Plaintiff, by excluding him from participation in, or denying him the benefits of, programs, activities and services for which Plaintiff is qualified, or for which he would be qualified with reasonable accommodation to his disability. These acts and omissions violate the rights of Plaintiff under [Title II of] the [ADA]." (Id., ¶ 69; see also id., ¶¶ 66, 68, 71.) "Title II of the ADA states that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'" (Id., ¶ 66.)

"The U.S. Department of Justice ('DOJ') regulation implementing Title II of the ADA clearly requires the provision of effective communication as part of its nondiscrimination mandate." (Id., ¶ 71.) "This regulation states: 'A public entity shall take appropriate steps to ensure that communications with applicants, participants, and [sic] members of the public, and companions with disabilities are as effective as communications with others.'" (Id. (quoting 28 C.F.R. § 35.160(a)).) "In order to ensure effective communication, the ADA requires that 'a public entity' furnish 'appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or

13

activity conducted by [sic] a public entity.'" (Id., ¶ 72 (ellipsis in original) (quoting 28 C.F.R. § 160(b)(1)).)

"On information and belief, Defendants failed to provide effective communication or provide comparable access to services, benefits, activities, programs, or privileges, policies, regular practices, and/or customs." (Id., ¶ 73.) Accordingly:

> As a proximate result of Defendants' violation of Plaintiff's rights under the ADA, Plaintiff has suffered from discrimination, unequal treatment, exclusion (including exclusion from Defendants' services, benefits, activities, programs, and privileges), violations of his rights under the laws of the United States, loss of dignity, frustration, humiliation, mental anguish, depression, suicidal thoughts, emotional pain and suffering, anxiety, trauma, embarrassment, and medical expenses that have been incurred and will be incurred in the future.

(Id., ¶ 74.)

As noted, Maxim Defendants moved to dismiss the Amended Complaint for failure to state a claim under Rule 12(b)(6) (see Docket Entry 32), a request Plaintiff opposes, at least as to Plaintiff's 42 U.S.C. § 1983 claims (see Docket Entry 50) (the "Opposition").

**DISCUSSION**

**I.  Motion to Dismiss Standards**

In reviewing a Rule 12(b)(6) motion, the Court must "accept the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff." Coleman v. Maryland Ct. of App., 626 F.3d 187, 189 (4th Cir. 2010), aff'd sub nom., Coleman v.

14

<u>Court of App. of Md.</u>, 566 U.S. 30 (2012). The Court must also "draw all reasonable inferences in favor of the plaintiff." <u>E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.</u>, 637 F.3d 435, 440 (4th Cir. 2011) (internal quotation marks omitted). It "do[es] not, however, accept as true a legal conclusion couched as a factual allegation" nor does it "accept unwarranted inferences, unreasonable conclusions, or arguments." <u>SD3, LLC v. Black & Decker (U.S.) Inc.</u>, 801 F.3d 412, 422 (4th Cir. 2015), <u>as amended on reh'g in part</u> (Oct. 29, 2015) (internal quotation marks omitted). It "can further put aside any naked assertions devoid of further factual enhancement." <u>Id.</u> (internal quotation marks omitted).

To avoid Rule 12(b)(6) dismissal, a complaint must contain sufficient factual allegations "to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). To qualify as plausible, a claim needs sufficient factual content to support a reasonable inference of the defendant's liability for the alleged misconduct. <u>Id.</u> "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." <u>Id.</u> (internal quotation marks omitted). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." <u>Id.</u> In other

15

words, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. Moreover, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint" cannot "survive a Rule 12(b)(6) motion." Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009). "At bottom, determining whether a complaint states . . . a plausible claim for relief . . . will 'be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" Id. (quoting Iqbal, 556 U.S. at 679).

## II. Preliminary Matters

As an initial matter, the Opposition contends that, because Maxim Defendants filed the Motion late, they "lack standing to pursue the [M]otion and they have waived the defenses asserted in the [M]otion" (Docket Entry 50 at 3). (See id. at 3-6.) However, after Plaintiff filed his Opposition, he consented to Maxim Defendants' then-pending motion for extension of time to file the Motion (Docket Entry 36). (See Docket Entry 54 at 2.) The Court therefore granted the extension motion and "accept[ed the Motion] as if timely filed." (Text Order dated Oct. 15, 2019.) Accordingly, Plaintiff's timeliness-related contentions lack merit.

16

In addition, although Plaintiff generically alleges that "Defendants" violated his rights under Section 1983, Section 1985, and the ADA, ambiguity exists regarding whether Plaintiff intended to pursue claims under Section 1985 and the ADA against Maxim Defendants given the Amended Complaint's utter lack of any individualized factual allegations that would support such claims. (See generally Docket Entry 23.) Nevertheless, Maxim Defendants moved to dismiss all potential claims, asserting, inter alia, that "[n]one of the [required] elements for a § 1985(3) conspiracy claim are alleged with any particularity in the Amended Complaint as to the Maxim Defendants" (Docket Entry 33 at 15), as well as that "Plaintiff has alleged a non-discriminatory and generalized financial incentive system that Plaintiff believes to be perverse — but that is not a cognizable conspiracy under § 1985" (id. at 16). They further contended that Plaintiff's ADA claim fails against Maxim Defendants because, inter alia, they are not public entities, as Title II requires. (See id. at 17.)

Notwithstanding Maxim Defendants' Section 1985 and ADA contentions, the Opposition addresses only Maxim Defendants' Section 1983 arguments. (See, e.g., Docket Entry 50 at 8 ("Here, Maxim [Defendants] are subject to a 1983 claim, and it would be a travesty if the actions of [Maxim Defendants] as alleged in the [Amended] Complaint do not amount to at least a jury question of deliberate indifference to [Plaintiff's] safety and serious medical

17

needs."); see generally Docket Entry 50 (focusing solely on Section 1983 claim).)   As such, Plaintiff effectively concedes that any Section 1985 and ADA claims against Maxim Defendants fail.   See, e.g., Kinetic Concepts, Inc. v. Convatec Inc., No. 1:08cv918, 2010 WL 1667285, at *6-9 (M.D.N.C. Apr. 23, 2010) (finding that "[the d]efendants conceded the [disputed] issue by failing to respond to it at the appropriate time," and noting that, under both this Court's Local Rules and as a "general principle," a litigant "who fails to address an issue . . . concede[s] the issue") (collecting cases).   For this reason alone, the Court should grant Maxim Defendants' request to dismiss any Section 1985 and ADA claims against them.

Moreover, any Section 1985 and ADA claims against Maxim Defendants do not withstand Rule 12(b)(6) scrutiny.   Pursuant to Section 1985,

> [i]f two or more persons . . . conspire . . ., for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).   Furthermore:

> The law is well settled that to establish a sufficient cause of action for "conspiracy to deny equal protection of the laws" under section 1985(3), a plaintiff must prove:  (1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based,

18

> invidiously discriminatory animus to (3) deprive the
> plaintiff of the equal enjoyment of rights secured by the
> law to all, (4) and which results in injury to the
> plaintiff as (5) a consequence of an overt act committed
> by the defendants in connection with the conspiracy.

Simmons v. Poe, 47 F.3d 1370, 1376 (4th Cir. 1995). Here, rather than asserting "a specific class-based, invidiously discriminatory animus," id., the Amended Complaint alleges that financial considerations motivated Maxim Defendants' actions (see Docket Entry 23, ¶ 58 ("[A]ll of [] Defendants and their employees are incentivized to carry out medical visits as quickly as possible. For the contractors and their employees, the quicker the medical visits are carried out, the more profitable for the contractors. . . . Due to this and other reasons, [] Defendants acted in concert to coverup [sic] the assaults on [] Plaintiff.")). Accordingly, the Amended Complaint fails to plausibly allege a Section 1985 claim against Maxim Defendants.

In turn, Title II provides that, "[s]ubject to the provisions of [Subchapter II of the ADA], no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (emphasis added). As relevant here, the ADA defines "public entity" as "any State or local government," or "any department, agency, special purpose district, or other instrumentality of a State or States or

19

local government." 42 U.S.C. § 12131(1)(A)-(B). "By its plain language, this definition 'does not include private individuals or private entities,'" <u>Wright v. Carroll Cty. Bd. of Educ.</u>, No. 11cv3103, 2013 WL 4525309, at *19 (D. Md. Aug. 26, 2013) (collecting cases), such as Maxim Defendants (<u>see</u> Docket Entry 23, ¶¶ 4-6). <u>See, e.g.</u>, <u>City & Cty. of San Francisco v. Sheehan</u>, 575 U.S. 600, __, 135 S. Ct. 1765, 1773 (2015) ("Only public entities are subject to Title II . . . ."); <u>Smith v. Glanz</u>, 662 F. App'x 595, 597 (10th Cir. 2016) (explaining that "only public entities, and not individual public employees . . . may be held liable under the ADA" and that "no individual . . . may be held liable under Title II of the ADA"). The fact that, per the Amended Complaint, Maxim "contracted with NCDPS to perform essential state functions with regard to the prison system and as to [] Plaintiff" (Docket Entry 23, ¶ 4), does not change this reality. <u>See, e.g.</u>, <u>Edison v. Douberly</u>, 604 F.3d 1307, 1310 (11th Cir. 2010) ("A private contractor does not . . . become liable under Title II [of the ADA] merely by contracting with the State to provide governmental services, essential or otherwise."); <u>Wright</u>, 2013 WL 4525309, at *19-20 (finding Title II inapplicable to actions of private parties and collecting cases). Accordingly, any Title II claim against Maxim Defendants fails as a matter of law.[5]

---

    5   In any event, the Amended Complaint does not plausibly allege that Maxim Defendants discriminated against Plaintiff either
(continued...)

Finally, the Motion asks the Court to award Maxim Defendants "attorneys' fees and costs, in accordance with 42 U.S.C. § 1988." (Docket Entry 32 at 2.) Section 1988 provides that, "[i]n any action or proceeding to enforce a provision of [S]ection[ 1983 or Section 1985] . . ., the [C]ourt, in its discretion, may allow the prevailing party[] . . . a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b). However, Maxim Defendants fail to develop this request in either their memorandum in support of the Motion or their reply. (See Docket Entries 33, 51.) Under such circumstances, the Court should decline to award attorney's fees.

## III.  Section 1983 Claim

Finally, Plaintiff contends that Maxim Defendants violated his eighth-amendment rights. (See Docket Entry 23, ¶¶ 49-50.)  In particular, Plaintiff asserts that Maxim Defendants violated his rights "[t]o be free from deliberate indifference to a substantial risk of serious harm" and to receive "adequate medical care and to be free from deliberate indifference to medical needs." (Id.,

---

5(...continued)
deliberately or with deliberate indifference (see generally Docket Entry 23), as required for a compensatory damages claim under Title II. See, e.g., Bone v. University of N.C. Health Care Sys., No. 1:18cv994, 2019 WL 4393531, at *17 (M.D.N.C. Sept. 13, 2019) (explaining that, under Title II, "compensatory damages are available only upon proof of intentional discrimination or disparate treatment, rather than mere disparate impact," which obliges "a plaintiff [to] show that the defendant knew that harm to a federally protected right was substantially likely and failed to act on that likelihood" (internal quotation marks omitted)), report and recommendation adopted, No. 1:18cv994, 2020 WL 1062421 (M.D.N.C. Mar. 5, 2020).

21

¶ 50; see also Docket Entry 50 at 8 ("[I]t would be a travesty if the actions of Bowen and Maxim as alleged in the Complaint do not amount to at least a jury question of deliberate indifference to [Plaintiff's] safety and serious medical needs.").) In response, Maxim Defendants argue that the Amended Complaint fails to plausibly allege their violation of Plaintiff's constitutional rights. (See, e.g., Docket Entry 33 at 10 ("[N]owhere in the Amended Complaint is there a factual assertion of any specificity with regard to how Nurse Bowen's conduct was either deliberately indifferent or that it caused Plaintiff's asserted constitutional deprivations.").) Conversely, "Plaintiff contends that the acts of Bowen and Maxim establish reckless indifference as a matter of law based on the medical evidence thus far presented, which has been incorporated in the First Amended Complaint." (Docket Entry 50 at 8.) Plaintiff's contentions lack merit.

## A. Deliberate Indifference Standards

"It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Helling v. McKinney, 509 U.S. 25, 31 (1993). However, "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could

22

be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994).

As such,

> [a]n inmate's Eighth Amendment claim involves a subjective component and an objective component. "Specifically, Eighth Amendment analysis necessitates inquiry as to whether the prison official acted with a sufficiently culpable state of mind (subjective component) and whether the deprivation suffered or injury inflicted on the inmate was sufficiently serious (objective component)." These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called "punishment," and absent severity, such punishment cannot be called "cruel and unusual."

Iko v. Shreve, 535 F.3d 225, 238 (4th Cir. 2008) (citation omitted).

Thus, "[t]he question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial 'risk of serious damage to his future health.'" Farmer, 511 U.S. at 843. "To prove deliberate indifference, plaintiffs must show that 'the official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety.'" Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016) (brackets in original) (quoting Farmer, 511 U.S. at 837); see also id. ("Put differently, the plaintiff must show that the official was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and . . . dr[ew] th[at] inference.'" (brackets, emphasis, and ellipsis in original)). In

23

the medical context, this requires a plaintiff to establish that the defendants "acted with 'deliberate indifference' (subjective) to [his] 'serious medical needs' (objective)." Iko, 535 F.3d at 241.[6]   A defendant displays deliberate indifference where he possesses "*actual knowledge of the risk of harm* to [an] inmate" and "*also . . .* recognize[s] that *his actions [a]re insufficient* to mitigate the risk of harm to the inmate arising from his medical needs." Id. (emphasis in original) (internal quotation marks omitted).

"[D]eliberate indifference entails something more than mere negligence, . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer, 511 U.S. at 835.  "It requires that a [defendant] actually know of and disregard an objectively serious condition, medical need, or risk of harm." De'lonta v. Johnson, 708 F.3d 520, 525 (4th Cir. 2013) (internal quotation marks omitted).  A plaintiff can satisfy this standard by showing "that a [defendant] knew of a substantial risk from the very fact that the risk was obvious." Scinto, 841 F.3d at 226 (internal quotation marks omitted).

---

6   A medical need qualifies as serious if it "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Id. (internal quotation marks omitted).

A plaintiff can also establish "a prima facie case of deliberate indifference" where "'a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official . . . had been exposed to information concerning the risk and thus must have known about it.'" Id. (brackets and ellipsis in original) (quoting Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004)). In addition, "'[f]ailure to respond to an inmate's known medical needs raises an inference [of] deliberate indifference to those needs.'" Id. (brackets in original).

## B. Analysis

The only allegations in the Amended Complaint specific to Maxim Defendants and their interactions with Plaintiff state, in full:

> Almost an hour [after Johnson evaluated Plaintiff, "plac[ing] him on Behavior Observations overnight" (Docket Entry 23, ¶ 26)], on Monday, August 15, 2016, [Plaintiff] was treated by Stacy Bowen, RN, for an injury to his arm. The injury to [Plaintiff's] arm was consistent with some of the notes provided in Blue Ridge Hospital's records concerning [Plaintiff] being sexually assaulted, yet Bowen treated it as a minor injury with no mention of sexual assault. This, in addition to other information received by Bowen, allowed Bowen to draw the inference that a sexual assault had occurred, and Bowen[,] upon information and belief, drew such an inference. Upon information and belief, Bowen also knew or should have known that [] Plaintiff had suffered a bruised backside. Bowen ignored various glaring signs that [] Plaintiff had been, and was at further risk of being, a victim of sexual assault. Bowen detected and ignored [] Plaintiff's injury, and ignored [] Plaintiff's

25

> attempts to provide additional detail beyond the obvious
> physical signs of injury. Bowen was otherwise
> deliberately indifferent to the obvious continued risk of
> harm to [] Plaintiff in these and other ways.

(<u>Id.</u>, ¶ 27.)

As Maxim Defendants maintain (<u>see</u> Docket Entry 33 at 9-11), these allegations largely qualify as "naked assertions devoid of further factual enhancement," <u>SD3, LLC</u>, 801 F.3d at 422 (internal quotation marks omitted), which the Court must "put aside," <u>id.</u>, in analyzing a Rule 12(b)(6) motion. Stripped of "legal conclusion[s] couched as . . . factual allegation[s]," <u>id.</u> (internal quotation marks omitted), "unadorned, the-defendant-unlawfully-harmed-me accusation[s]," <u>Iqbal</u>, 556 U.S. at 678, and "mere conclusory statements," <u>id.</u>, the Amended Complaint alleges little more than that Bowen treated Plaintiff for an unspecified arm injury, which "was consistent with some of the notes provided in Blue Ridge Hospital's records [from two days later] concerning [Plaintiff] being sexually assaulted, yet Bowen treated it as a minor injury with no mention of sexual assault" (Docket Entry 23, ¶ 27).

Notably, the Amended Complaint lacks any factual allegations indicating how Plaintiff's unspecified <u>arm</u> injury either "allowed Bowen to draw the inference that a sexual assault had occurred" or alerted Bowen to Plaintiff's "bruised backside." (<u>Id.</u>) Moreover, even assuming Bowen somehow <u>should have known</u> — from Plaintiff's arm injury, developmental delay, earlier black eye and "'vague threats of harm to himself and/or others'" (<u>id.</u>, ¶ 26), and/or

26

"attempts to provide additional detail beyond the obvious physical signs of injury" (id., ¶ 27) — that Plaintiff suffered a sexual assault, nothing in the Amended Complaint indicates that Bowen did in fact realize either that such assault had occurred or remained likely to occur (see generally Docket Entry 23), as required for a deliberate indifference claim, see, e.g., Farmer, 511 U.S. at 838 (explaining that "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment"); Parrish, 372 F.3d at 303 ("It is not enough that the officers *should have* recognized [a substantial risk of harm]; they actually must have perceived the risk." (emphasis in original)).[7]

Nevertheless, the Opposition urges the Court to deny the Motion, asserting:

> Here, Maxim and Bowen are subject to a 1983 claim, and it would be a travesty if the actions of Bowen and Maxim as alleged in the Complaint do not amount to at least a jury question of deliberate indifference to [Plaintiff's] safety and serious medical needs. [Plaintiff] was an adult with the cognitive ability of an

---

7    Even assuming that Buchanan's investigation occurred on August 15, 2016, nothing in the Amended Complaint indicates that Bowen knew of such investigation or its results. (See, e.g., Docket Entry 23, ¶ 35 (alleging that neither medical record from August 15, 2016, reflects sexual assault).) Accordingly, the Amended Complaint does not establish that Maxim Defendants "had been exposed to information concerning [a sexual assault] risk," Scinto, 841 F.3d at 226 (internal quotation marks omitted), or otherwise "knew of [such] risk . . . [because it] was obvious," id. (internal quotation marks omitted).

27

> 8-year-old and suffered from borderline mental
> retardation, yet the named Defendants placed him in a
> prison cell with a violent, KKK member, and ignored
> [Plaintiff's] pleas for help. In fact, [] Plaintiff
> contends that the acts of Bowen and Maxim establish
> reckless indifference as a matter of law based on the
> medical evidence thus far presented, which has been
> incorporated in the First Amended Complaint.

(Docket Entry 50 at 8.) In Plaintiff's view, "[t]he omissions and commissions of Bowen and Maxim give rise to a claim to a cruel and unusual punishment claim [sic] in violation of the Eighth Amendment." (Id. at 9.) These assertions miss the mark.

First, the Amended Complaint contains no allegations about the character or history of Plaintiff's cellmate, let alone that he qualified as "a violent[] KKK member" (id. at 8). (See generally Docket Entry 23.) Accordingly, the Court cannot consider this description at the Rule 12(b)(6) stage. See, e.g., E.I. du Pont, 637 F.3d at 449 (explaining that "statements by counsel that raise new facts constitute matters beyond the pleadings and cannot be considered on a Rule 12(b)(6) motion"). Nor, if it were considered, does that description of Plaintiff's cellmate indicate that such cellmate posed a danger of sexual assault. Moreover, contrary to Plaintiff's assertions, Bowen did not "place[ Plaintiff] in a prison cell with a violent, KKK member." (Docket Entry 50 at 8.) Rather, Bowen released Plaintiff back to "an area where he had mental health and 'restricted housing'" (Docket Entry 23, ¶ 34 (certain internal quotation marks omitted)) as part of the

28

overnight observation Johnson ordered approximately one hour prior to Bowen and Plaintiff's singular interaction (see id., ¶¶ 26-27).

In sum, the Amended Complaint fails to plausibly allege that Bowen "knew of and disregarded an excessive risk to [Plaintiff's] health or safety." Scinto, 841 F.3d at 225 (internal quotation marks and brackets omitted). Thus, the Court should dismiss Plaintiff's Section 1983 claim against Bowen.[8] Further, notwithstanding the assertion that it "does not allege that Maxim and Worldwide are liable merely via *respondeat superior*" (Docket Entry 23, ¶ 54), the Amended Complaint contains no independent allegations of wrongful conduct by Maxim regarding Plaintiff; instead, any claim against Maxim rests on Bowen's conduct. (See generally Docket Entry 23.) Thus, because the Amended Complaint fails to plausibly allege a Section 1983 claim against Bowen, it likewise fails to plausibly allege one against Maxim. The Court should therefore dismiss Plaintiff's Section 1983 claims against Maxim Defendants.

## CONCLUSION

The Amended Complaint does not plausibly allege any Section 1983, Section 1985, or ADA claims against Maxim Defendants.

---

8    Given this resolution, the Court need not separately analyze whether qualified immunity would shield Bowen from Plaintiff's claims. (Compare Docket Entry 33 at 2, 19-20 (urging qualified immunity), with Docket Entry 50 at 9-13 (contesting qualified immunity).)

However, Maxim Defendants did not justify an award of attorney's fees.

      **IT IS THEREFORE RECOMMENDED** that the Motion (Docket Entry 32) be granted insofar as Plaintiff's claims against Maxim Defendants be dismissed, with each side to bear its own attorney's fees.

      This 19th day of August, 2020.

                 /s/ L. Patrick Auld
                   **L. Patrick Auld**
           **United States Magistrate Judge**